UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRACY JENKINS, as Personal Representative
 of the Estate of THEODDEUS R. GRAY,
Deceased,

                                    Case Number 19-10383
        Plaintiff,                  Honorable David M. Lawson

v.

OFFICER TOM PRICE, OFFICER JESSIE
SMITH, OFFICER JAMES ZIEMIECKI,
OFFICER TREVOR HEAD, OFFICER
TRAVIS KAUFMAN, and CITY OF
ST. CLAIR SHORES,

           Defendants.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

      Theoddeus Gray was shot to death by officers of the St. Clair Shores police department. Gray was armed with a handgun at the time. The incident involved an initial exchange of gunfire where Gray was shot but was able to flee. That was followed by a second confrontation during which, the plaintiff alleges, Gray dropped his weapon but then was gunned down in a hail of gunfire by the police. Gray's estate brought suit under various federal and state legal theories, which depend on a finding that the defendants used excessive force during one or both confrontations. The defendants move for summary judgment, arguing that Gray's conduct, which consisted initially of shooting and later pointing his gun at police officers, justified their lethal response. All of the witness testimony plainly favors the defendants. However, the plaintiff contends that circumstantial evidence and on-the-scene videos create a fact question over the legality of the police officers' conduct. Viewing the entire record in the light most favorable to

the plaintiff, the Court cannot agree.  The defendants are entitled to a judgment as a matter of law. The motion will be granted.

## I. Facts

On November 4, 2018, officers from the St. Clair Shores police department shot and killed Theoddeus R. Gray.  He was 29 at the time.  That evening, Gray, with dozens of others, attended a baby shower at the Lakeland Manor, a banquet hall, in St. Clair Shores, Michigan.  According to an FBI report, Gray owed money to an associate, "Bud," from a drug transaction.  After receiving a tip that Gray was at the banquet hall, Bud (or someone on his behalf) drove there to collect.

Surveillance video from the banquet hall's lobby shows Gray (dressed in a white shirt with red trim on his collar) and Bud (wearing a teal and white baseball jacket) pacing while exchanging apparently heated words.   Video from the banquet hall's exterior shows the two stepping outside, Gray walking away, and then returning and brandishing a handgun in front of Bud.  An unidentified woman then escorted Gray inside.  Gray and Bud quickly came back outside, where Gray again brandished a handgun and squared up with Bud.  The two continued their heated exchange until they separated and walked off camera.

A Lakeland Manor employee called 911 at 6:25 p.m. to report "a gun man in [the] hall." Mot. Summ. J. Ex. F, Dispatch Notes, ECF No. 41-7, PageID.389.  She described the person as a "black male wearing a white shirt [with] red trim around the collar," and reported that he stepped "outside" and began "throwing a fit with a gun," emphasizing that she "saw the gun."  Dispatch notes taken by the Macomb County Sheriff's Office indicate that the gun looked like a "Glock or Baretta."   The St. Clair Shores police department immediately sent officers to the scene; the

dispatcher described the suspect as an armed African American man wearing a white shirt with a red collar.  *Ibid.*

### A.  The First Police Encounter

Officer James Ziemiecki arrived first.  A surveillance camera on the west parking lot of the banquet hall shows Bud retrieving what looks like an "AK style" rifle, freeze up, then dart away to stash the gun behind a nearby wall.  Mot. Summ. J., Ex. E, Lakeland W. Parking Lot Surveillance Video, 0:35-0:53.  Seconds later, Officer Ziemiecki pulled into the parking lot, stepped out of his car, and walked past Bud toward the front of the banquet hall, looking for Gray. *Id.* at 1:02-1:28. Officers Tom Price, Trevor Head, and Travis Kaufman then arrived and parked by the front of the banquet hall, which faces south.  Mot. Summ. J., Ex. D, Lakeland Entrance Video, 4:18-5:08; Ex. G, Marked Arial Photograph, ECF No. 41-8.

Surveillance video from the front of the banquet hall shows Gray walking east from the parking lot with Officer Ziemiecki following.  Mot. Summ. J., Ex. D, Lakeland Entrance Video, 5:10-5:20.  Officer Ziemiecki then pointed at Gray and yelled, instructing him to stop.  *Id.* at 5:20-21.  Gray walked out of the frame, and Officer Ziemiecki began to chase after him.  *Id.* at 5:20-5:21.  Officers Price, Head, and Kaufman exited their vehicles and joined the chase, accompanied by Axe, a dog.  *Id.* at 5:20-5:25.

A south-facing surveillance camera at the northeast corner of the banquet hall caught Gray sprinting north around the corner with the four officers and Axe in pursuit.  Mot. Summ. J., Ex. H, Lakeland Northeast Video, 0:02-0:05.  As Gray ran toward the camera's direction, he pulled a pistol from his waistband, looked back in the direction of his pursuers, and placed his hand on the slide of the gun as if to chamber a round.  *Id.* at 0:04-0:06.  Gray then ran off-screen as Axe caught up to him.  *Ibid.*

Another camera at the northeast corner, which faces west toward a driveway leading to the parking lot, shows a muzzle flash by Axe's right side, who is running northbound in Gray's direction. Mot. Summ. J., Ex. I, Lakeland Northeast Driveway Video, 0:06-00:10. The video does not capture much, as the shooter is located just beyond the lower-right corner of the screen. However, the location of the shot is consistent with Gray's position relative to Axe in the video captured by the south-facing camera, and the officers present testified that Gray shot toward them, although they were uncertain if the intended target was them or the dog. Mot. Summ. J., Ex. H, Lakeland Northeast Video, 0:02-0:06; Ex. P, Ziemiecki dep., ECF No. 41-17, PageID.439-40; Ex. O, Kaufman dep., ECF No. 41-16, PageID.416; Ex. X, Head dep., ECF No. 41-25, PageID.564; Resp. to Mot. Summ. J., Ex. F, Price dep., ECF No. 50-7, PageID.737.

After the first shot, Axe stumbled slightly but charged forward, followed by Officers Head and Kaufman, who drew their guns. Mot. Summ. J., Ex. I, Lakeland Northeast Driveway Video, 0:07-0:15. Officer Head testified that he returned fire, shooting about six rounds at Gray. Mot. Summ. J., Ex. X, Head dep., ECF No. 41-25, PageID.566. Officer Kaufman held his fire, concerned that he would strike Officer Head, who was directly in front of him. Mot. Summ. J., Ex. O, Kaufman dep., ECF No. 41-16, PageID.417. Police audio recorded during the incident captured Officer Ziemiecki yelling "shots, gun!" after the first shot rang out, followed by an intense volley of gunfire. Mot. Summ. J., Ex. J, Kaufman Audio, 02:53-3:02; Ex. X, Head dep., ECF No. 41-25, PageID.564.

The video captured by the south-facing camera shows the four officers fanning out, drawing their weapons, and pursuing Gray shortly after he exited the frame. Mot. Summ. J., Ex. H, Lakeland Northeast Video, 0:06-0:10. Once Officers Head, Kaufman, and Price left the frame in Gray's direction, Officer Ziemiecki, positioned to the right of the group, shot several rounds in

Gray's direction while kneeling by a bush.  *Id.* at 0:12; Ex. P, Ziemiecki dep., ECF No. 41-17, PageID.440.  Officer Ziemiecki then got up to join the chase, as Axe re-entered the frame and ran in the opposite direction of Gray.  *Id.* 0:13-20.  Officer Ziemiecki then informed Axe's handler, Officer Price, that Axe had been shot, and Officer Price returned to the entrance of the banquet hall to find him.  *Id.* at 0:16-0:30; Ex. P, Ziemiecki dep., ECF No. 41-17, PageID.440.  Officer Price shot about twelve rounds at Gray before turning around to find Axe.  Resp. to Mot. Summ. J., Ex. F, Price dep., ECF No. 50-7, PageID.737.  Axe eventually succumbed to his injuries.  Resp. to Mot. Summ. J., Ex. B, Sledge dep., ECF No. 50-3, PageID.721.

The officers shot Gray at least once while he fled northbound, but they did not incapacitate him.  Investigators identified Gray's bloodstained boot with a bullet hole in the right heel in front of the adjacent Harper Auto Electric building just north of the banquet hall.  Mot. Summ. J., Ex. K, FARO Scan, No. 41-12, PageID.400.  A forensic scan also identified a blood trail from Axe, who turned and ran south after being shot.  *Id.* PageID.401.

However, the evidence about Axe's entry wound is somewhat inconsistent.  The video depicts a muzzle flashing to the right of the canine.  Mot. Summ. J., Ex. I, Lakeland Northeast Driveway Video, 0:06-00:10.  But Dr. Todd Sledge, a veterinarian who conducted Axe's necropsy and the plaintiff's expert witness, found no "obvious lesions on the right side of the body," even after skinning the animal.  Resp to Mot. Summ. J., Ex. B, Sledge dep., ECF No. 50-3, PageID.721.  He concluded that Axe must have been shot on the left side.  *Ibid.*  On the other hand, Dr. L.J. Dragovic, a forensic pathologist retained by the defendants, (with no experience in canine anatomy), opined that Axe was shot in the mouth, with the bullet traveling left through Axe's body.  Resp. to Mot. Summ. J., Ex. D, Dragovic Report, ECF No. 50-5, PageID.729.  But he admitted

that he never actually examined Axe, nor did he see any photographs depicting wounds to the dog's mouth.  Resp. to Mot. Summ. J., Ex. E, Dragovic dep., ECF No. 50-4, PageID.724.

### B.  The Second Police Encounter

After Axe was shot, Gray continued north past the Harper Auto Electric building, then ran east through the parking lot to the north of the Harper building.  Officer Ziemiecki followed Gray on foot, while Officers Head and Kaufman flanked Gray, running west through the driveway north of the banquet hall and south of the Harper Auto Electric building.  However, a chain-link fence separated the driveway from the Harper Auto's parking lot, so Officer Kaufman scaled the fence while Officer Head provided cover.  Mot. Summ. J., Ex. I, Lakeland Northeast Driveway Video, 0:16-0:28; Kaufman dep., ECF No. 41-16, PageID.418.  Officer Kaufman cut his hands as he climbed the fence, causing him to bleed "all over" them.  Mot. Summ. J., Ex. O, Kaufman dep., ECF No. 41-16, PageID.422, Resp. to Mot. Summ. J., Ex. V, Kaufman Hands Photo, ECF No. 50-23.

As Officer Kaufman scaled the fence, more officers arrived to assist at around 6:30 p.m. Sergeant Margaret Eidt drove into the parking lot north of the Harper Auto Electric building, where Gray had run and stopped.  Mot. Summ. J., Ex. M, Sgt. Eidt Dash Cam, 1:01-1:06.  Seconds later, Officer Jessie Smith pulled up to the scene, exited his car, and approached Officer Ziemiecki and Sergeant Eidt.  Mot. Summ. J., Ex. N, Smith Dash Cam., 1:18-121 (Officer 69).  Sergeant Eidt remained in her car, while Officers Ziemiecki and Smith took cover behind a van in front of Gray.  Mot. Summ. J., Ex. P, Ziemiecki dep., ECF No. 41-17, PageID.441.  Finally, Officer John Hammell arrived, parking to the north of the other officers.  Mot. Summ. J., Ex. R, Hammell Dash Cam.  The officers cornered Gray at the northwest corner of the Harper Auto Electric parking lot:

Officer Kaufman approached from the southwest alley while Officers Ziemiecki, Smith, and Hammell confronted him from the northeast.

After climbing the fence, Officer Kaufman entered the alleyway west of the Harper Auto Electric building and ran north toward the parking lot in Gray's general direction. Mot. Summ. J., Ex. O, Kaufman dep., ECF No. 41-16, PageID.418. As Officer Kaufman approached, he testified that he was startled by Gray's close proximity and demanded that Gray drop the gun. *Id.* at PageId.419. He says that Gray pointed a gun at him instead. *Ibid.* Believing that he "had been beat," the officer turned, fell, scrambled to his feet, and retreated to a nearby fenced enclosure that provided little protective cover. *Ibid.*; Reply, Ex. CC, Photo of Alley, ECF No. 61-5. Officer Kaufman aimed his gun at Gray and again demanded that Gray drop the gun. Mot. Summ. J., Ex. O, Kaufman dep., PageID.419-420. Kaufman testified that Gray "continued to stand and point" the gun, so Officer Kaufman opened fire, shooting twice. *Id.* at PageID.420.

Officer Ziemiecki, who faced Gray on the northeast side of the building, testified that he saw Gray "fumbling with his hands" and heard officer Kaufman from the west side of the building demand that Gray drop the gun. Ziemiecki dep., ECF No. 41-17, PageID.441. Officer Smith joined, giving "many verbal and strict commands to drop the gun." *Ibid.* Officer Ziemiecki was unsure whether Gray had dropped the gun or not at that point but continued to demand that he stop what he was doing and drop the gun. *Ibid.* Officer Ziemiecki says that he saw Gray raise his hands toward Officer Kaufman, heard a gunshot, and "returned fire," shooting about ten times. *Ibid.*

Officer Smith corroborated Ziemiecki's testimony. Mot. Summ. J., Ex. N, Smith dep., ECF No. 41-26, PageID.582 (testifying that he "could hear Officer Kaufman and Officer Head screaming for [Gray] to drop the gun," saw Gray aim a gun at Officers Kaufman and Head, heard shots, then fired seven rounds at Gray). Officer Head similarly testified that he heard his fellow

officers "shouting drop the gun, drop the gun" and that several shots rang out as he approached Kaufman and Gray; he never fired at Gray during the second encounter.  Mot. Summ. J., Ex. X, Head dep., ECF No. 41-25, PageID.566.  Those instructions plainly can be heard on audio file from Kaufman's in-car video.  Mot. Summ. J., Ex. J, Kaufman In-Car Audio, 2:54-2:58.  However, Sergeant Eidt provided a slightly different account, testifying that Gray pointed a handgun east toward her and Officer Ziemiecki before the officers shot and killed him.  Mot. Summ. J., Ex. Q, Eidt dep., ECF No. 41-18, PageID.453.

Two civilians also witnessed Gray's shooting death.  Patrick Lapensee, who lived across the street from the Auto Electric building, testified that he observed the shooting from his window after the first round of gunfire erupted.  He saw Gray with "his hand up pointing . . . what appeared to be a gun," and that he "heard more gunfire and [Gray] went down."  Mot. Summ. J., Ex. U, Lapensee dep.,   ECF No. 41-22, PageID.524.  However, he also testified that Gray was facing east, not south toward Officer Kaufman, and he admitted that he could not "definitively state" that Gray was armed, but he "assumed" that he was armed because of the circumstances and dim lighting.  *Id.* at PageID.522, 526, 530.  John Montgomery, who lived about "three or four" houses away from the Auto Electric building, testified that he watched the shooting from his front door, also after being alarmed by gunfire.  Mot. Summ. J., Ex. V, Montgomery dep., ECF No. 41-23, PageID.537, 540.  He said that he "heard officers shouting at [Gray] to lower his weapon" and "saw [Gray] raise his weapon" before the officers shot him.  *Id.* at 545-46, 552, 554.  He also stated that he believed Gray fired his gun first, as he heard one shot from the right, followed by a volley from the left, but acknowledged that his view was partially blocked by a fence.  *Id.* at PageID.547, 554.

The videos taken at the scene are not conclusive; they do not plainly show that Gray was holding a gun in his hands, but the images are not clear enough to rule it out, either. Sergeant Eidt's dash cam video briefly shows Gray standing upright, facing the alley, then slumping over after what sounds like gunshots. Mot. Summ. J., Ex. M, Eidt Dash Cam., 1:01-1:06. The car then pivots, moving the camera out of view. *Id.* at 1:05-1:10. Audio reports indicate that seconds later, another, much more distinct, volley of gunfire erupted. *Id.* at 1:13-1:20. On Officer Hammell's dash cam, Gray can be seen, almost immediately after Hammell pulled up, walking south toward the west alley where Officers Kaufman and Head were located. Mot. Summ. J., Ex. R, Hammell Dash Cam., 1:25-1:27. Gray then promptly collapses after being shot. *Id.* at 1:26-1:33. The camera view is too far to determine whether he was armed, but Gray's left arm appeared slightly bent.

The defendants submitted a video exhibit that synchronized the audio from Officer Hammell's dash cam with the audio from Officer Kaufman's camera microphone, which was closer to the position where Gray was shot. Mot. Summ. J., Ex. W, Synced Video of Hammell and Kaufman. It shows that after Gray fell, the officers approached him slowly. *Id.* at 1:38-1:45. Officer Head arrived first and kicked an object away from Gray's body. The audio from this segment records a sliding metallic sound. *Id.* at 1:44-1:48. Radio feedback squeal can be heard in the audio, along with Kaufman shouting, "My prep's broke," referring to his portable radio. *Id.* at 1:38-2:01. One of the officers stated, "It's keyed up," and then instructed Kaufman to "go get your prep." *Id.* at 1:53-1:59. Kaufman then is seen running back into the alley, returning about 30 seconds later. *Id.* at 1:58-2:39. He then discarded an object or two, but it is not clear what he dropped. *Ibid.* Kaufman dropped the object(s) about ten feet from Gray's body. A subtle, almost imperceptible, thud can be heard at that point, but no metallic clanking. *Id.* at 2:34-2:37.

Officers Kaufman and Head testified that Kaufman ran to retrieve his radio, which had been hung up on the fence and "stayed keyed in," meaning that it "was stuck on an open mic," preventing the officers from immediately calling for paramedics.  Mot. Summ. J., Ex. O, Kaufman dep., ECF No. 41-16, PageID.421-22; Ex. X, Head dep., ECF No. 41-25, PageID.567.  Officer Kaufman could not remember what he had dropped when he returned from the alley, testifying that "maybe [he] dropped [his] flashlight in fumbling with the [first aid] prep," or he may have dropped his "mechanic's gloves" when he "was trying to put on the latex gloves," as "they're kept in the same pocket."  *Id.* Ex. O, PageID.425.

After more officers approached, Officer Head again is seen kicking an object away from Gray's body, causing another metallic skidding noise.  *Id.* at 2:45-2:50.  Officers Ziemiecki, Smith, Kaufman, and Head each testified that the object that Officer Head kicked was a gun.  Mot. Summ. J., Ex. P, Ziemiecki dep., ECF No. 41-17, PageID.442; Ex. X, Head dep., ECF No. 41-25, PageID.566; Ex. Y, Smith dep., ECF No. 41-26, PageID.583; Mot. Summ. J., Ex. Ex. O, Kaufman dep., ECF No. 41-16, PageID.421.  Additionally, Officer Hammell's dash cam reveals Officer Hammell telling Officer Head, "the gun's right there," to which Officer Head responds, "I kicked it," before he kicked it the second time. An audible metallic, sliding sound again can be heard. Mot. Summ. J., Ex. R, Hammell Dash Cam., 2:45-2:50.  Officer Kaufman, along with Officers Hammell and Head, then began checking for wounds and compressing Gray's chest after Officer Head noticed that Gray was still breathing.  Mot. Summ. J., Ex. X, Head dep., ECF No. 41-25, PageID.567.

About eight minutes after the officers shot Gray, an ambulance arrived and carried him off. Resp. to Mot. Summ. J., Ex. K, Hammell Dash Cam Extended Video, 18:37:13-18:38:45.  About 15 minutes after that, officers began preserving evidence at the scene.  *Id.* at 18:54:50.  Officers

- 10 -

found several pools of blood where Gray fell and live rounds scattered around the area.  Resp. to Mot. Summ. J., Ex. S, Overhead FARO Scan, ECF No. 50-28.  They also found a glove in the alley from where Officer Kaufman fired a shot at Gray.  *Ibid.*; Resp. to Mot. Summ. J., Ex. R, Glove Photo, ECF No. 50-19.

About seven to nine feet away from where Gray fell, officers found an FN 5.7 handgun and magazine that were separated from each other.  *Ibid.*; Resp. to Mot. Summ. J., Ex. P, Gun/Magazine Photos, ECF No. 50-17, PageID.785-788.  The magazine, which had a live round in it, was resting on top of an expended, crimped casing.  *Id.* PageID.788.  Both the magazine and slide of the gun had blood splattered on them, but investigators never tested to determine whose blood it was.  Resp. to Mot. Summ. J., Ex. U, Lab Report, ECF No. 50-22, PageID.838.

The parties' expert witnesses draw different inferences from the evidence.  Roy D. Sieno, the defendants' retained firearms expert who works at a crime laboratory, believes that the evidence shows that Gray intended to continue the fight but that his gun had jammed.  According to him, the discovery of a separated magazine, a crimped "stovepiped" cartridge, and blood on the slide of the gun and magazine supports an inference that Gray tried to clear the jammed gun before he was killed.  Mot. Summ. J., Ex. S, Sineo Aff. ¶¶ 6,13, 15, ECF No. 41-20, PageID.462.

On the other hand, Roger Clark, a former police officer and the plaintiff's retained expert on police practices, opines that Gray discarded his gun before he was killed and that the officers planted his discarded gun closer to his body to cover their tracks.  Mot. Summ. J., Ex. T, Clark dep., ECF No. 41-21, PageID.507.  He testified that separating a magazine from a gun "is typical" of an individual attempting to discard it so that he can potentially claim that it was not loaded.  *Id.* PageID.505.

Clark conceded that all the witnesses, both police and citizen, testified that they saw Gray point a weapon at police officers behind the Harper Auto Electric building before Gray was shot, and there were no witnesses that disputed that version of the events. *Id.* at Page.ID 497-498. However, Clark testified that his opinion was based on the video recordings that showed that Gray did not fire any shots at the police when he was in the parking lot, from the videos one cannot discern that Gray held anything in his hands at the time, and the video depicts an officer (Kaufman) coming back from the alley and dropping two items. *Id.* at PageID.498-499. Clark agreed that the stovepiped shell casing likely was caused by the jammed gun, and that removing the magazine was part of the unjamming process.

## C. Proceedings

Theoddeus Gray's estate, now through Tracy Jenkins, his personal representative, filed a complaint in this Court against the City of St. Clair Shores and Officers Tom Price, Jessie Smith, James Ziemiecki, Trevor Head, and Travis Kaufman for Gray's shooting death, alleging excessive force in violation of the Fourth Amendment against the officers via 42 U.S.C. § 1983 (Count 1); municipal liability against the City of Saint Clair Shores (Count 2); state law assault and battery against the officers (Count 3); and gross negligence against the officers (Count 4). The defendants then moved for summary judgment on all counts, and the Court heard oral argument on September 9, 2021.

## II.

The defendants argue that they did not violate Gray's constitutional rights because they appropriately used deadly force when Gray shot at them, ignored repeated commands to drop the gun, then pointed the gun at Officer Kaufman when Gray was cornered in the Harper Auto store parking lot. Defendants Head and Price contend that they are entitled to dismissal because they

- 12 -

were not involved in the parking lot shooting that resulted in Gray's death, although they did return fire during the initial chase.  The individual defendants also contend that if they did unreasonably use deadly force, they are entitled to qualified immunity because courts have not clearly established that shooting a defendant under these circumstances amounts to a constitutional violation.  The defendants also mount challenges to the municipal liability and state law claims.

The plaintiff maintains that fact questions preclude summary judgment on the excessive force and assault-and-battery claims because the record can be read to show that the officers' use of deadly force during the first encounter was unreasonable, as Gray was shot in the back of his foot while running away, and during the second encounter Gray was unarmed.  She bases the latter argument mainly on the video evidence, inconsistencies that she perceives in the testimony, and her expert's opinion.  She criticizes the City of St. Clair Shores for failing to enact a policy that prohibits the police shooting of a suspect that discarded his weapon.  And she contends that the police officers were grossly negligent when they released the police dog when they arrived, thereby escalating the confrontation.

As the parties well know, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A trial is required when "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The party bringing the motion first must explain why the record is so settled that no genuine issues of material fact exist by "identify[ing] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Pittman v. Experian Info. Sols., Inc.*,

901 F.3d 619, 627-28 (6th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). To rebut that showing, "[t]he nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 628 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). The opposing party must base that rebuttal on specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Notably, however, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 251-52). However, the plaintiff cannot demonstrate a genuine fact dispute when conclusive video evidence undermines her version of the facts as she presents them. *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## A.

The individual defendants raise the defense of qualified immunity, which consists of two elements: 1) whether the facts alleged make out the violation of a constitutional right; and 2) whether the right was clearly established at the time of the alleged violation. *Cunningham v. Shelby Cnty., Tennessee*, 994 F.3d 761, 764 (6th Cir. 2021) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). The Court may take up the questions in either order, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), and in this case the defense can be addressed by focusing on the first element.

There is not much dispute about the law that applies in this case.  The plaintiff brought her federal claims under 42 U.S.C. § 1983, which provides redress against "'[e]very person' who 'under color of' state law 'subjects, or causes to be subjected,' another person 'to the deprivation of any rights, privileges, or immunities secured by the Constitution[.]'"  *Dibrell v. City of Knoxville*, 984 F.3d 1156, 1159 (6th Cir. 2021) (quoting *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 489 (6th Cir. 2020) (citing 42 U.S.C. § 1983)).  As a general proposition, the Fourth Amendment, upon which the plaintiff relies in Counts 1 and 2 of her complaint, protects all citizens from the use of excessive force — deadly or not — by law enforcement officers in the course of an arrest.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  The parties do not dispute that the defendant officers "seized" Gray "by shooting him, thereby triggering the Fourth Amendment's 'reasonableness' requirement."  *Jordan v. Howard*, 987 F.3d 537, 543 (6th Cir. 2021) (citing *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)).

"The reasonableness of a seizure depends on context: officers may use 'some degree of physical coercion or threat' to effect an arrest, but the amount of force must be objectively reasonable under the totality of the circumstances."  *Stewart v. City of Euclid, Ohio*, 970 F.3d 667, 672 (6th Cir. 2020) (quoting *Graham*, 490 U.S. at 396).  "This objective test requires courts to judge the use of force from the perspective of a reasonable officer on the scene, 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'"  *Jordan*, 987 F.3d at 543 (quoting *Graham*, 490 U.S. at 397).  The three main factors courts consider when evaluating the reasonableness of force include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.  In deadly force cases, however, "the most critical factor is the immediate danger to officers

and members of the public in the area." *Stewart*, 970 F.3d at 672 (citing *Cass v. City of Dayton*, 770 F.3d 368, 375 (6th Cir. 2014)). An officer's use of deadly force is objectively reasonable if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11.

Courts must "evaluate the use of force by focusing on the split-second judgment made immediately before the officer used allegedly excessive force, not on the poor planning or bad tactics that might have created the circumstances that led to the use of force." *Reich v. City of Elizabethtown*, 945 F.3d 968, 978 (6th Cir. 2019) (quotation marks omitted). The Sixth Circuit warns against "allow[ing] the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day." *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992).

1.

The plaintiff analyses the November 4, 2018 incident in two parts, the first consisting of the encounter when Gray was running from the police away from the banquet hall and apparently was shot in the back of the foot. She contends that the officers' use of deadly force was unreasonable because Gray was running away and did not pose a lethal threat to them.

The undisputed evidence undermines that argument. Officer Ziemiecki was the first to respond to the dispatch to the banquet hall that reported an armed man at the gathering and saw Gray, who fit the description. Gray took off on foot prompting officers Ziemiecki, Price, Head, and Kaufman to chase after him with Axe the dog. Surveillance footage at the scene shows Gray brandish a firearm and turn to look at the officers and Axe while running away. Another camera shows a muzzle flashing to Axe's right, consistent with Gray's position relative to Axe captured from the previously mentioned camera.

The officers present at the scene each testified that Gray shot in their general direction, prompting them to return fire. Audio from Officer Kaufman's camera corroborates the defendants' account, and the plaintiff offers no testimony to contradict it. Thus, the officers unquestionably had "probable cause to believe that [Gray] pose[d] a threat of serious physical harm, either to the[m] or to others," and their use of deadly force was justified. *Garner*, 471 U.S. at 11; *Howard*, 987 F.3d at 545 (officers had probable cause to use lethal force where defendant grabbed and moved a handgun in their direction).

The plaintiff disagrees for two main reasons. First, she contends that Gray's actions did not justify the use of deadly force. She disputes that Gray shot Axe, based on conflicting expert testimony, and even if Gray did shoot the canine, she maintains that "it is objectively unreasonable for officers to use deadly force to protect an animal."

That argument, while true, is beside the point. Who shot Axe does not matter; all that matters is that the officers had probable cause to believe that Gray posed a risk of serious danger to them or other people. Even if Gray's intended target was the dog, it is undisputed that his aim was in the general direction of the pursuing police officers. "When a person aims a weapon in a police officer's direction, that officer has an objectively reasonable basis for believing that the person poses a significant risk of serious injury or death." *Greathouse v. Couch*, 433 F. App'x 370, 373 (6th Cir. 2011).

Second, the plaintiff contends that the officers unconstitutionally shot Gray in the back as he attempted to flee. She cites *Tennessee v. Garner* in support. *See Garner*, 471 U.S. at 4, 11 (holding that police violated decedent's Fourth Amendment right by shooting decedent in the back of the head after fleeing from the scene of a burglary). This argument, however, overreads *Garner*'s holding. That case stands for the proposition that officers may not use deadly force

"[w]here the suspect poses no immediate threat to the officer and no threat to others." *Garner*, 471 U.S. at 11.  Here, Gray was armed and dangerous, as made apparent by the fact that he fired his gun toward the officers while actively attempting to evade arrest.  The fact that Gray's back faced the officers when they shot him does not detract from the legitimacy and immediacy of the threat that he posed at that split second.  *Reich*, 945 F.3d at 981 ("This is not a case where 'a jury could conclude that [the police were not] in any danger[.]'") (quoting *Mullins v. Cyranek*, 805 F.3d 760, 767 (6th Cir. 2015)).

The undisputed record demonstrates that there was no constitutional violation arising from Gray's first encounter with the police.

### 2.

The plaintiff believes that she has a stronger argument for excessive force during the second, fatal encounter between Gray and the police.  That is because police officers may not use deadly force against an individual who no longer poses a clear threat of serious danger to them or others.  *Russo v. Cincinnati*, 953 F.2d 1036, 1045 (6th Cir. 1992) (holding that continued gunfire after decedent may have dropped his knives constituted excessive force); *Margeson v. White Cnty.*, 579 F. App'x 466, 472 (6th Cir. 2014) (stating that a second volley of gunfire after decedent dropped a rifle but disputedly reached for a gun constituted excessive force); *Harris v. Lasseigne*, 602 F. App'x 218, 221-22 (6th Cir. 2015) (finding that an officer may have used excessive force by shooting decent who may have thrown his shotgun over a fence before being shot).  The plaintiff insists that the evidence in the record creates a genuine dispute on whether Gray had discarded the gun before he was cornered in the Harper Auto store parking lot where the police fired multiple gunshots at him.

That argument, of course, rises or falls with the video and circumstantial evidence. Although there are minor inconsistencies in the testimony, the witnesses all support the contention that Gray posed a serious threat of serious physical harm to one or more of the police officers when they responded with deadly force. The witnesses testified that Gray possessed a handgun, or at the very least, leveled his arms at Officer Kaufman as if to take aim before being shot. Ziemiecki dep., ECF No. 41-17, PageID.441; Smith dep., ECF No. 41-26, PageID.582; Lapensee dep., ECF No. 41-22, PageID.524; Montgomery dep., ECF No. 41-23, PageID.540. Sergeant Eidt and Patrick Lapensee both testified that Gray was facing east, not south, at the time, and Ziemiecki testified that he was unsure about whether Gray was armed, but they were certain that Gray appeared to be armed and was menacing. (Lapensee's certainty was based on his "assum[ption]" that Gray was armed due to the circumstances and dim lighting.).

There is *no* evidence that Gray actually shot at anyone from his final position in the parking lot. But whether he "actually fired the weapon is wholly immaterial here. The issue is whether or not he threatened to do so," *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000), or, more precisely, whether a reasonable officer perceived such a threat at the time, "focusing on the split-second judgment made immediately before" the officers fired upon Gray, *Reich*, 945 F.3d at 978 (quotation marks omitted). *See also Mullins*, 805 F.3d at 767 (acknowledging prior holdings that "'[w]ithin a few seconds of reasonably perceiving a sufficient danger, officers may use deadly force even if in hindsight the facts show that the persons threatened could have escaped unharmed." (quoting *Untalan v. City of Lorain*, 430 F.3d 312, 315-16 (6th Cir. 2005)).

The plaintiff asserts, though, that Gray could not have fired a shot because he discarded his weapon in the alley. She insists that both videos depicting Gray before his death do not show clearly that he possessed a handgun when the officers shot and killed him. The defendants do not

dispute that point, but that does not help the plaintiff.  Careful and repeated viewing of the video evidence reveals nothing conclusive on that point.  Those videos do not allow one to rule in or out Gray's handgun possession at the time.  They do not confirm the testimony, but they do not contradict it, either, as to make out a fact question.  The absence of evidence does not constitute evidence of absence.

Is the physical evidence sufficient to contradict the testimony and thereby create a substantial question of fact?  Evidence technicians found the gun and magazine separated on the floor.  That could support both the plaintiff's discarded gun theory and the defendants' gun jam theory, but it does not compel either inference, and it does not create a genuine issue of fact.  One of the videos shows Officer Kaufman dropping an object or two at the scene about 30 seconds after returning from the alley from where he shot Gray.  But the image does not depict that the object was a gun or magazine, and the accompanying audio does not support that the object was made of metal.  Compare, for instance, the images of Officer Head kicking an object that he said was the gun, which includes audio of a sliding metallic sound across the pavement.

There is evidence that the gun and the magazine both had blood on them, which investigators never tested.  The record shows that only two people were bleeding at the scene: Gray, after being shot, and Officer Kaufman, after cutting his hands while climbing the fence to the Harper Auto parking lot.  One could speculate that the blood was Kaufman's, but such an inference would not be based on more than that.  And it does not establish a genuine fact question over whether Gray was armed when the shots were fired.

That leaves the testimony of Roger Clark, the plaintiff's police practices expert.  Clark theorizes that Gray had discarded the gun by the time he was cornered in the Harper Auto parking lot and therefore posed no threat to the officers.  He explains the presence of Gray's weapon at the

scene by accusing Kaufman of planting it near Gray's body after he retrieved it from the alley, where Gray supposedly discarded it. But there is no evidence that Gray was ever in the alley. Gray ran from the banquet hall down Harper Avenue around the front of Harper Auto and then into the parking lot. That is where Kaufman said he saw him suddenly after scaling the fence. And although there is evidence that Kaufman came from the alley after purportedly going back there to retrieve his prep radio, and then tossing something to the ground, there is no evidence supporting an inference that the object was a gun. Clark's opinions are based on a thin and insubstantial foundation. As the Sixth Circuit tells us, "*Boyd* [*v. Bapler*] instructs that such speculation is not enough to controvert consistent officer testimony to the contrary and generate a genuine dispute of material fact for trial." *Jordan*, 987 F.3d at 545.

Because there is no genuine issue that officers had probable cause to believe that Gray posed a threat of serious physical harm to them when they fired their weapons in the Harper Auto parking lot, the defendants are entitled to judgment as a matter of law on the plaintiff's Fourth Amendment claim in Count 1 of the complaint.

### B.

Defendant St. Clair Shores argues that it is entitled to summary judgment on Count 2, which alleges municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Because a municipality cannot be held vicariously liable under 42 U.S.C. § 1983 for the actions of its employees, *ibid.*, the plaintiff must offer evidence in this case that the City had adopted an unconstitutional policy, practice, or custom; and that the claimed injury was caused by the execution of that policy. *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993).

In her complaint, the plaintiff alleged that the City failed to train its officers adequately in the use of deadly force, but she does not defend that claim against the City's summary judgment

challenge.  Instead, the plaintiff contends that the City of St. Clair maintains unconstitutional formal policies that do not include a prohibition against shooting a suspect who discarded his weapon.

St. Clair Shores's use-of-force policy does not contain a negative command of that sort.  It reads:

> It is the policy of this agency that officers use only an objective and reasonable amount of force necessary to overcome the amount of resistance offered by an individual.  Lethal force may be used when the life of a citizen or officer is in jeopardy; or to affect an arrest of a person when all other reasonable means of apprehension have been exhausted or do not exist and there is substantial risk that the person to be apprehended may cause death or serious bodily harm if he/she escapes or if the apprehension is delayed, which outweighs the risks involved in the use of lethal force.

Resp. To Mot. For Summ. J., Ex. AB, Use of Force Policy, ECF No. 50-29, PageID.863.

The plaintiff has not cited any authority supporting the proposition that this policy is unconstitutional, nor that a city must list each activity prohibited by police.  The Supreme Court rejected a similar argument in the context of a detainee who alleged that city authorities deprived him of necessary medical attention while in custody.  *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989).  In that case, the City's policy stated that the city jailer "shall . . . have [a person needing medical care] taken to a hospital for medical treatment, with permission of his supervisor . . . ." *Id.* at 387.  The Supreme Court found that "[i]t is difficult to see what constitutional guarantees are violated by such a policy," and emphasized that allowing such a claim to proceed would render a city automatically "liable under § 1983 if one of its employees happened to apply the policy in an unconstitutional manner," thereby impermissibly resting liability on *respondeat superior.  Ibid.*

Moreover, it is well accepted that "[t]here must be a constitutional violation for a § 1983 claim against a municipality to succeed — if the plaintiff has suffered no constitutional injury, his *Monell* claim fails."  *North v. Cuyahoga County*, 754 F. App'x 380, 389 (6th Cir. 2018)

(citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).  However, "[w]hether and under what circumstances a municipality can be liable when the plaintiff suffered a constitutional violation but cannot attribute it to any individual defendant's unconstitutional conduct is a more complicated question — one that [the Sixth Circuit] recently noted in *Winkler v. Madison County*, 893 F.3d 877 (6th Cir. 2018))."  *Ibid.*  There is language in appellate decisions suggesting that there can be no municipal liability where no individual defendant has violated the plaintiff's constitutional rights.  *See Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001).  That brush, however, paints too broadly.  Courts "have interpreted *Heller* to permit municipal liability in certain circumstances where no individual liability is shown."  *North*, 754 F. App'x at 389-90.  That might occur, for instance, "when a government actor in good faith follows a faulty municipal policy."  *Winkler v. Madison Cty.*, 893 F.3d 877, 900 (6th Cir. 2018) (quoting *Epps v. Lauderdale County*, 45 F. App'x 332, 334 (6th Cir. 2002) (Cole, C.J., concurring)).

Under that line of authority, if the plaintiff could show that some policy, practice, or custom endorsed by the City led to the use of deadly force against Gray, then she might be able to pursue a municipal liability claim even in the absence of a verdict attributing an unconstitutional use of force to any particular named individual defendant.  However, as noted above, such a claim cannot be pursued because the City's use-of-force policy is not unconstitutional.

Defendant St. Clair Shores is entitled to judgment in its favor on Count 2 of the complaint.

## C.

The plaintiff also brought assault-and-battery and gross negligence claims under state law against the defendants.  The defendants argue that those claims must be dismissed under Michigan's Governmental Tort Liability Act (GTLA), Mich. Comp. Laws § 691.1407.  The GTLA protects both governmental agencies and their employees against civil liability.  Mich. Comp.

Laws § 691.1407(2). However, state actors may nevertheless be held liable if their actions amount to "gross negligence," Mich. Comp. Laws § 691.1407(2), or if they commit an intentional tort in bad faith or with malice. *Odom v Wayne Cnty.*, 482 Mich. 459, 480, 760 N.W. 2d 217, 228 (2008).

For assault cases involving the police, state law holds that an intentional tort action "'may lie only if the officer has utilized wanton or malicious conduct or demonstrated a reckless indifference to the common dictates of humanity.'" *Odom*, 482 Mich. at 474, 760 N.W.2d at 225 (quoting *Dickey v. Fluhart*, 146 Mich. App. 268, 276, 380 N.W.2d 76, 79 (1985)). Michigan courts describe "a lack of good faith as malicious intent, capricious action . . . or willful and corrupt misconduct.'" *Ibid.* (internal citations omitted). In addition to demonstrating that an officer committed an intentional tort with malice, a plaintiff must also demonstrate that the "acts were discretionary, as opposed to ministerial." *Odom*, 482 Mich. at 480, 760 N.W. 2d at 228.

Liability of police officers under the Fourth Amendment calls for an objective inquiry "'without regard to their underlying intent or motivation.'" *Jordan*, 987 F.3d at 543 (quoting *Graham*, 490 U.S. at 397). In contrast, Michigan law incorporates a subjective test that "'protects a defendant's honest belief and good-faith conduct with the cloak of immunity.'" *Latits v. Phillips*, 298 Mich. App. 109, 115, 826 N.W.2d 190, 194 (2012) (quoting *Odom*, 482 Mich. at 482, 760 N.W.2d at 229). "[T]he pivotal inquiry is whether, gauged from the defendant police officer's subjective standpoint, he was acting in good faith when he engaged in the challenged action." *Graves v. Hedger*, No. 346257, 2020 WL 6937058, at *3 (Mich. Ct. App. Nov. 24, 2020) (citing *Latits*, 298 Mich. App. at 115, 826 N.W.2d at 194).

There is no dispute that the defendant police officers acted within the scope of their authority, that they shot at Gray, and that their own conduct elevated their acts from ministerial to discretionary in nature. *Odom,* 482 Mich. at 476, 760 N.W. 2d at 226. But for the same reasons

as discussed above, the plaintiff cannot show that any of the officers acted with malice or bad faith during the first shootout, when they undeniably reacted to Gray firing a gun in their general direction.  And officers Ziemiecki, Kaufman, and Smith each testified that during the second encounter, they personally believed that Gray posed a danger to themselves or others.  There is insufficient evidence to establish a genuine fact question on Gray's armed status at that time.  And even if Gray were unarmed, Michigan courts have emphasized that officers are "entitled to the protections of governmental immunity regardless of whether [they were] correct in [their] belief" that they were "acting properly in using deadly force."  *Latits*, 298 Mich. App. at 115, 826 N.W. 2d at 195.

The plaintiff alleged that the defendants were grossly negligent because they (1) needlessly escalate the situation by releasing a canine, (2) dropped items at the scene, and (3) attempted to conceal their conduct.  The latter two grounds will not support a gross negligence claim because "Michigan 'has rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence.'"  *Miller v. Sanilac Cnty.*, 606 F.3d 240, 253-54 (6th Cir. 2010) (quoting *VanVorous v. Burmeister*, 262 Mich. App. 467, 483, 687 N.W.2d 132, 143 (2004)).  These allegations are fully premised on the plaintiff's contention that the officers intentionally shot Gray, and the plaintiff is "seemingly attempting to reframe [the officers'] alleged 'assault' of [Gray] as a claim for gross negligence," which is improper under Michigan law, *Brent v. Wayne Cnty. Dep't of Human Servs*, 901 F.3d 656, 701 (6th Cir. 2018).

The first ground is not premised on an intentional tort, but it lacks evidentiary support.  The plaintiff "identified no statue, contractual relationship, or common-law principle that imposes a duty running from [St. Clair Shores] police officers to private citizens" regarding the proper use of canines — particularly against individuals fleeing from police who were seen brandishing

firearms in public.  *Brent*, 901 F.3d at 701 (affirming judgment for defendants on plaintiff's gross negligence claim that officers failed to abide by policies against executing civil orders due to lack of evidence about such policies); *see also Mondak v. Taylor Police Dep't*, No. 330459, 2017 WL 1103618, at *5-6 (Mich. Ct. App. Mar. 23, 2017) (affirming summary judgment for defendants on gross negligence claim pertaining to canine bite due to insufficient evidence about deficient training, previous misbehavior or similar incidents, or violation of canine "handling procedures" or "other police manuals or rules").  Without any evidence illuminating the applicable standard of care, the plaintiff's gross negligence claim fails.  *Ibid.*

<div align="center">III.</div>

The plaintiff has not brought forth evidence that is sufficient to create a genuine issue of material fact on all the elements of her claims.  The defendants are entitled to a judgment of dismissal as a matter of law.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment ECF No. 41) is **GRANTED**.

It is further **ORDERED** that the complaint is **DISMISSED WITH PREJUDICE**.


<div style="margin-left: 50%;">s/David M. Lawson<br>DAVID M. LAWSON<br>United States District Judge</div>


Dated:   September 21, 2021

<div align="center">- 26 -</div>